# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 17-23575-CV-GAYLES/TORRES

NIKKI MCINTOSH, *et al.*,

      *Plaintiffs*,

v.

ROYAL CARIBBEAN CRUISES LTD.,

      *Defendant*.

_____/

## REPORT AND RECOMMENDATION
## <u>ON SUBJECT MATTER JURISDICTION</u>

The Honorable Darrin P. Gayles referred the case to determine whether we have subject matter jurisdiction over the above-styled case. [D.E. 72]. Having reviewed the record and held an evidentiary hearing regarding our subject matter jurisdiction, the Court concludes that this case falls within our admiralty jurisdiction. Based on the allegations in the operative complaint, however, diversity jurisdiction is lacking. Therefore, we recommend that Plaintiffs be granted leave to amend their complaint.

## *I.    BACKGROUND*

Plaintiffs contracted with Royal Caribbean to board the *Liberty of the Seas*, a cruise ship scheduled to depart from the Port of Galveston on Sunday, August 27, 2017.  Their ticket contracts specified that they would forfeit the payments made to buy their tickets if they cancelled their trip within 14 days of their scheduled departure.  This clause of the ticket contract proved especially frustrating when, in the week leading up to Plaintiffs' cruise, Hurricane Harvey stormed through the Gulf of Mexico and made landfall on the Texas coast.  Fearing that they would waste hundreds of their hard-earned dollars if they cancelled their tickets and relying upon repeated assurances from Royal Caribbean that their cruise would proceed as scheduled despite a dangerous hurricane, Plaintiffs traveled to Galveston and the surrounding areas in anticipation of their embarkation.  Ultimately, however, Plaintiffs' sailing dreams turned into a nightmare when Royal Caribbean canceled the cruise at the last minute and left them stranded in the wake of the deadliest hurricane to hit Texas in nearly a century.[1]

 On Thursday, August 24, 2017, Royal Caribbean informed Plaintiffs via online communication that the cruise line was monitoring Hurricane Harvey but nevertheless the *Liberty of the Seas* would keep her original schedule.  The following

---

[1]    *See* Eric S. Blake and Davis A. Zelinsky*, Tropical Cyclone Report: Hurricane Harvey*, NATIONAL HURRICANE CENTER, May 9, 2018, at 8, https://www.nhc.noaa.gov/data/tcr/AL092017_Harvey.pdf (last visited July 28, 2023) (finding that Hurricane Harvey was directly responsible for at least 68 deaths, all but three of which resulted from freshwater flooding, and was indirectly responsible for approximately 35 additional deaths caused by things like electrocution, motor-vehicle crashes, and isolation from necessary medical services).

day, as Hurricane Harvey strengthened into a Category 2 storm, the Port of Galveston announced the closure of its port operations, flights in and out of neighboring airports were being cancelled, Carnival Cruise Lines – one of Royal Caribbean's competitors – consciously diverted its ships away from Texas, and news reports began to circulate about the evacuations underway in Texas' coastal cities. Royal Caribbean, however, sent another update to Plaintiffs reiterating that the *Liberty of the Seas* would sail as planned.

On Saturday afternoon, Royal Caribbean informed Plaintiffs that it intended to sail the *Liberty of the Seas* according to her original schedule but that, due to the progression of Hurricane Harvey and the closure of the Port of Galveston, the situation remained uncertain. Royal Caribbean therefore advised that those booked as passengers on the *Liberty of the Seas* should not proceed to the port until Royal Caribbean told them it was okay to do so. By that time, catastrophic flooding had already begun. Hundreds of flights were cancelled. Roadways became impassable. It was not until late that night that Royal Caribbean conceded that its vessel would not sail as planned, announcing in an email to Plaintiffs that the departure of the *Liberty of the Seas* was delayed to Monday, August 28, 2017.

On Sunday morning, Plaintiffs' original departure date, Royal Caribbean confirmed the one-day delay and – for the first time – communicated that Plaintiffs' payments could be refunded in the form of a future-cruise credit if they wished to cancel their tickets. But that afternoon, Royal Caribbean changed course again and

announced that Plaintiffs' cruise was cancelled and that everyone scheduled to board the *Liberty of the Seas* on that day would be receiving a full refund.

As a result of the foregoing, Plaintiffs allege that they suffered physical and emotional injuries while struggling for survival in the devastation wrought by Hurricane Harvey. They have therefore sued Royal Caribbean for negligence and negligent infliction of emotional distress.

The issue presented at this juncture of the case is whether we have subject matter jurisdiction over Plaintiffs' lawsuit. Plaintiffs allege two foundations for this Court's power to adjudicate their dispute with the company in control of the *Liberty of the Seas*: (1) admiralty and (2) diversity of citizenship. Accordingly, the Court held an evidentiary hearing to determine whether federal jurisdiction exists in this case.

The most notable finding of that evidentiary hearing, which is a material consideration in the Court's analysis below, is that the decision to cancel the cruise was made by Michael Bayley – a Royal Caribbean executive based in Miami. Thus, the cancellation decision was not made by the Captain of the *Liberty of the Seas*, which at all relevant times was located on navigable waters, because the Captain was below Mr. Bayley in the chain of command that controls the vessel.

Royal Caribbean employs a "hurricane management team" to review each hurricane event and present recommendations about the fleet's operations to Royal Caribbean's brand president. In August 2017, Mr. Bayley was the brand president and the hurricane management team, which operated out of Royal Caribbean's headquarters in the Port of Miami, had roughly a dozen members. The team received

input from (and provided guidance to) the Captain of the *Liberty of the Seas*, but neither the Captain nor anyone else on board that ship was an official member of the team. In other words, Mr. Bayley and his team were not on navigable waters when making decisions about whether and when to cancel Plaintiffs' cruise; by contrast, they were dockside.[2] Thus, the record reflects that, when Mr. Bayley decided to cancel Plaintiffs' cruise on the afternoon of August 27, 2017, he made that decision on dry land. Likewise, the decisions to *not* cancel the cruise in the week leading up to its scheduled departure (or to otherwise amend its passenger-cancellation policy) in response to a hurricane constitute shoreside actions taken by Royal Caribbean. We discuss whether admiralty jurisdiction exists before turning to the issue of diversity.

## II.   ANALYSIS

### A.   *The law governing admiralty jurisdiction.*

A federal court's authority to resolve cases in admiralty flows initially from the Constitution, which extends federal judicial power to "all Cases of admiralty and maritime Jurisdiction." U.S. CONST., Art. III, § 2. Congress has also allocated by power by statute, giving the federal district courts "original jurisdiction" over any civil case of "admiralty or maritime" jurisdiction. 28 U.S.C. § 1333(1).

---

[2] According to the "Contact Us" page on Defendant's website, the address of Royal Caribbean's corporate headquarters is 1050 Caribbean Way, Miami, Florida 33132. But pragmatically, this Court need not search the Internet to ascertain the nerve center of Royal Caribbean's North American operations because this anchor-shaped building can be seen clearly from the windows of our Courthouse. It is only three blocks and one bridge east of us.

"The traditional test for admiralty tort jurisdiction asked only whether the tort occurred on navigable waters.  If it did, admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist." *Jerome B. Grubart, Inc., v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531-32 (1995).  The location of the tort normally depended upon where the plaintiff was harmed or, in common law terminology, where the "substance and consummation of the injury" took place.  *The Plymouth*, 70 U.S. (3 Wall.) 20, 33 (1866) (holding that admiralty jurisdiction did not exist when a warehouse was destroyed by a fire that started on board a ship docked nearby).  This occasionally led to ironic results.  For example, the Supreme Court held on multiple occasions that, when negligently piloted ships rammed structures on the land, the resulting claims were outside the law of admiralty because the damaged structures were on the land and not in the water.  *See, e.g., Martin v. West*, 222 U.S. 191, 195-97 (1911) (collision between a steamship and a drawbridge); *Cleveland Terminal & Valley R.R. Co. v. Cleveland S.S. Co.*, 208, U.S. 316, 319-21 (1908) (collision involving multiple vessels and land-based structures); *Johnson v. Chi. & Pac. Elevator Co.*, 119 U.S. 388, 389 (1886) (collision between a schooner and a warehouse, which caused a large quantity of corn stored in the warehouse to fall into the Chicago River).

This jurisdictional rule changed in 1948, however, when Congress passed the Extension of Admiralty Jurisdiction Act.  *Grubart*, 513 U.S. at 532.  The Act provided that "[t]he admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on

6

land." 46 U.S.C. § 30101(a).   The purpose of the Act was to end concern over the "sometimes confusing line between land and water" by empowering federal courts to adjudicate cases where an injury was caused by a vessel on navigable water even though the injury occurred on land.  *Grubart*, 513 U.S. at 532.

Over time, the federal courts explored the nuances to this expansion of its admiralty power and, in 1995, the Supreme Court defined the applicable test for determining whether admiralty jurisdiction exists in a maritime tort case: The party seeking to invoke admiralty jurisdiction must satisfy conditions of both location and connection with maritime activity.  *Id*. at 534.

> A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water.  The connection test raises two issues.  A court, first, must assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce.  Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Id*. (internal citations and quotations omitted).

In *Grubart*, the City of Chicago hired the defendant to replace the wooden pilings clustered around the piers of several bridges spanning the Chicago River, a navigable waterway.  *Id*. at 530.  The defendant carried out the work with two barges towed by a tugboat.  *Id*.  One barge carried the pilings and the other carried a crane that pulled out the old pilings and helped drive in the new ones.  *Id*.  It was alleged that, in replacing the pilings, the defendant pierced the riverbed in such a way that an underground freight tunnel was punctured, causing water to spill into the tunnel

and ultimately into the basements of several skyscrapers in the Loop. *Id.* The question presented to the Supreme Court was whether a lawsuit premised on the defendant's allegedly negligent pile-driving could be resolved in federal court pursuant to admiralty jurisdiction. *Id.* at 531.

After articulating the applicable two-part test, the Supreme Court held that admiralty jurisdiction existed in the *Grubart* case. *Id.* at 548. Justice Souter, writing for the majority, observed that the location test was met because the barges used by the defendant – as well as the crane affixed to one of them – qualified as a "vessel" on navigable water. *Id.* at 534-35. "If Great Lakes caused the flood, it must have done so by weakening the structure of the tunnel while it drove in new pilings or removed old ones around the bridge piers." *Id.* And because that presumed action occurred through the use of a vessel situated on a navigable waterway of the United States, the location test was satisfied. *Id.* Furthermore, the connection test was satisfied because the tunnel puncture had a potentially disruptive impact on maritime commerce and the act of repairing a navigable waterway qualified as a traditional maritime activity. *Id.* at 538-40.

### 1.   *Jurisdiction Based on Location and Connection Tests*

Since *Grubart*, the federal courts have had ample opportunity to explore both the "location test" and the "connection test" articulated by Justice Souter. Here, Royal Caribbean concedes that the connection test is easily met under these facts. [D.E. 67 at 7]. Accordingly, we focus much of our attention below on how courts have

evaluated the location test to assess whether admiralty jurisdiction exists in this case.

For guidance on that score we turn first to *Anderson*, where the Eleventh Circuit held that the location test was satisfied, and thus admiralty jurisdiction existed, when a fighter jet dropped two bombs on an island during a training exercise. *Anderson v. United States*, 317 F.3d 1235, 1236 (11th Cir. 2003). The bombs misfired and thereby injured the civilian plaintiff, who argued that admiralty jurisdiction did *not* exist because his injury was caused by an airplane in the sky rather than a vessel on navigable waters. *Id.* The Eleventh Circuit disagreed, reasoning that the fighter jet qualified as "appurtenance" to the USS John F. Kennedy – the naval aircraft carrier that launched the fighter jet – and therefore holding that the plaintiff's injury was caused by a vessel on navigable waters. *Id.* at 1237-38.

To determine whether an item is an "appurtenance" to a vessel, the Court "must look to the relation it bears to the actual service of the vessel." *Id.* at 1238 (quoting *In re Frolic*, 148 F. 921, 922 (D.R.I. 1906)) (modifications adopted). Accordingly, an appurtenance is "any specifically identifiable item that is destined for use aboard a specifically identifiable vessel and is essential to the vessel's navigation, operation, or mission." *Id.* (quoting *Gonzalez v. M/V Destiny Panama*, 102 F. Supp. 2d 1352, 1354-57 (S.D. Fla. 2000)); *see also, e.g., Grubart*, 513 U.S. at 535 (treating the crane on a barge as an appurtenance); *United States v. Dewey*, 188 U.S. 254, 268 (1903) (finding that the term "ship or vessel of war" includes "her

armament, search lights, stores,—everything, in short, attached to or on board the ship in aid of her operations.").

The fighter jet in *Anderson* was one of the aircraft carrier's primary offense and defensive weapons; it was an "extension" of the ship's "eyes" and "ears" that was utilized to carry out the mission of the vessel upon which it was embarked. *Anderson*, 317 F.3d at 1238. And at the time that the fighter jet dropped its bombs in the plaintiff's vicinity, it was "carrying out the Kennedy's mission by testing its offensive and defensive capabilities in air-to-ground strikes." *Id*. Therefore, held the Eleventh Circuit, the plaintiff's injuries were caused by an appurtenance to a vessel, which in turn meant that the injury was caused by the vessel itself because maritime law generally does not distinguish between a vessel and her appurtenances. *Id*. (citing *Grubart*, 513 U.S. at 535).

Similarly, admiralty law encompasses injuries that occur on the gangway – i.e., the walkway that typically connects a vessel to a dock. *Minott v. M/Y Brunello*, 891 F.3d 1277, 1283 (11th Cir. 2018). In *Minott*, the plaintiff was hired to perform maintenance on a vessel that was docked in navigable waters. *Id*. at 1280. As he was walking up the gangway to board the vessel, the captain "suddenly and without warning" put the engines in gear and caused the plaintiff to be thrown from the gangway, resulting in serious injuries to his head, neck, and spine. *Id*. Because it is "well-established that traditional maritime law encompasses the gangway," the Eleventh Circuit held that the location test was satisfied. *Id*. at 1283-84.

In what "may represent the outer boundaries of admiralty jurisdiction over torts," the Eleventh Circuit also extended jurisdiction over a sexual battery that took place in a cruise ship's port-of-call. *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 901 (11th Cir. 2004). In *Doe*, a crew member encouraged the plaintiff to visit a specific bar during the ship's visit to a Bermudian port. *Id*. at 897-99. When the plaintiff arrived at the bar, which was only a 10-minute walk from the ship, the crew member was there and the two socialized until the early hours of the morning. *Id*. After the bar closed, the crew member escorted the very-intoxicated plaintiff toward the ship; however, before returning to the ship, the crew member raped the plaintiff in a nearby park. *Id*. Recognizing that ports-of-call perform "an essential function" of the cruise experience, the Eleventh Circuit held that "nothing about the particular facts of this case takes the crew member sexual battery outside the scope of this Court's admiralty jurisdiction." *Id*. at 902; *see also Chaparro v. Carnival Corp*., 693 F.3d 1333, 1336 (11th Cir. 2012) (assuming that federal admiralty jurisdiction existed and therefore federal admiralty law applied to tort claims arising from gang violence in a cruise ship's port-of-call).[3]

Conversely, many cases have fallen outside of the spatial parameters set by the location test. In *Crowley*, for example, our Court held that we could not exercise admiralty jurisdiction over a dispute involving a misrepresentation about shipping costs because the misrepresentation was allegedly made solely inside the defendant's Miami office. *Crowley Liner Services, Inc. v. Transtainer Corp*., No. 06-cv-21995, 2007

---

[3]     In *Doe*, the Eleventh Circuit also acknowledged that a federal court must have admiralty jurisdiction if it is going to apply admiralty law. *Doe*, 394 F.3d at 899-900.

WL 433352, at *6 (S.D. Fla. Feb. 6, 2007).  We have also declined to extend admiralty jurisdiction over a fire that was caused by a vessel docked on dry land.  *In re Lavender*, No. 03-cv-60757, 2004 WL 2935860, at *3 (S.D. Fla. Nov. 5, 2004).   And we reached the same result when the plaintiff was injured in a port terminal after her cruise was concluded.  *Vincenzo v. Carnival Corp.*, No. 09-cv-20234, 2012 WL 1428888, at *2 (S.D. Fla. Apr. 24, 2012).

Similarly, in *Broughton*, the Eleventh Circuit held that an underwriter's failure to ensure the financial soundness of an insurer was beyond the scope of admiralty jurisdiction even though the underwriter's negligence concerned the insurance of a boat.  *Broughton v. Florida Intern. Underwriters, Inc.*, 139 F.3d 861, 864-65 (11th Cir. 1998).   In *Maher*, the Third Circuit held that a negligence dispute between a port terminal and the local port authority regarding the establishment of port fees failed the location test because it was an entirely land-based dispute.  *Maher Terminals, LLC v. Port Authority of New York and New Jersey*, 805 F.3d 98, 111-12 (3d Cir. 2015).   And in *Hufnagel*, the Fifth Circuit declined to extend admiralty jurisdiction because an oil-drilling platform does not constitute a "vessel" for the purposes of admiralty law.  *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 351-52 (5th Cir. 1999).

### 2.   *Jurisdiction Based on Application of Maritime Contracts*

But maritime tort cases are not the only species of litigation that a federal court's admiralty jurisdiction extends to; disputes about a maritime contract also fall within this Court's admiralty jurisdiction notwithstanding strict application of the

location test.  *See Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 23 (2004).
*Kirby* was "a maritime case about a trainwreck."  *Id*. at 18.  The question presented
there was whether an end-to-end shipping contract qualified as a "maritime contract"
even though the last leg of the journey involved transportation by rail.  *Id*. at 22-23.

In *Kirby*, an Australian manufacturer sold 10 multimodal-containers worth of
machinery to a General Motors plant in Huntsville, Alabama.  *Id*. at 19.    The
manufacturer contracted with an Australian freight forwarding company to arrange
for the shipment of this machinery from Sydney to Huntsville.  *Id*.  The freight
forwarding company in turn contracted with a German shipping company to
accomplish the manufacturer's end-to-end shipping request.  *Id*. at 21.  The shipping
company then carried the machinery on board one its ships from Sydney to Savannah
without incident.  *Id*.  To accomplish the last leg of the journey, however, the shipping
company hired Norfolk Southern to transport the machinery from Savannah to
Huntsville by rail.  *Id*.  Importantly, the shipping company limited its liability – and
the liability of its subcontractors – to $500 per container.  *Id*.  Thus, after the Norfolk
Southern train carrying the machinery derailed and the manufacturer sought
damages from the rail company under tort and contract theories, a dispute arose
regarding whether Norfolk Southern could benefit from the shipping company's
contractual liability limitations.  *Id*. at 21-22.

Explaining that federal courts have admiralty jurisdiction over maritime
contracts, the Supreme Court first established whether that the contracts at issue
were maritime contracts.  *Id*. at 23.  In contrast to the "spatial" inquiry employed for

tort claims, contractual disputes require a "conceptual" approach to assess whether the contract at issue is a "maritime contract" that gives rise to admiralty jurisdiction. *Id*. Employing this conceptual approach, the Supreme Court held that the contracts were maritime contracts and therefore should be adjudicated pursuant to the federal court's admiralty jurisdiction and interpreted pursuant to federal maritime law. *Id*. at 24.

With this framework in mind, we proceed to consider whether the unique facts of this case allow the Court to extend our admiralty jurisdiction under any of these recognized formulations. We ultimately conclude that multiple rationales support the existence of admiralty jurisdiction in this case.

### B.   *The federal courts have admiralty jurisdiction over this case.*

Royal Caribbean concedes that the "connection test" is met and therefore disputes the existence of admiralty jurisdiction only for location-based reasons. To do so, the cruise line hangs its hat on the fact that when Mr. Bayley decided to cancel Plaintiffs' cruise on August 27, 2017, he did so from Royal Caribbean's headquarters in Miami. We are not persuaded that this fact defeats maritime jurisdiction for two reasons. First, because the foundation of this dispute is a maritime contract, admiralty jurisdiction exists under the conceptual approach defined by *Kirby*. Second, the logic of *Doe* and other binding precedent persuades us that the extension of our jurisdiction here is appropriate.

**1.**   ***Admiralty jurisdiction exists in this case because maritime contracts form the foundation of this lawsuit.***

As an initial matter, we cannot overlook that Plaintiffs filed this lawsuit because they were ticketed passengers for a certain voyage of the *Liberty of the Seas*. Although they have not alleged any breach of contract claims arising from their ticket contracts, Plaintiffs' tort theories inevitably stem from what they perceive to be Royal Caribbean's negligent performance under those ticket contracts.

There is no dispute that these ticket contracts qualify as maritime contracts that are subject to the admiralty jurisdiction of the federal courts. Indeed, the Eleventh Circuit has already acknowledged that ticket contracts for passage on a cruise ship qualify as maritime contracts. *Davis v. Valsamis, Inc.*, 752 F. App'x 688, 691 (11th Cir. 2018) ("Plaintiffs' ticket constitutes a maritime contract because its primary objective is to accomplish the transportation of passengers by sea.") (citing *Kirby*, 543 U.S. at 24); *see also Angel v. Royal Caribbean Cruises, Ltd.*, No. 02-cv-20409, 2002 WL 31553524, at *4 n. 3 (S.D. Fla. Oct. 22, 2002) (noting that a "cruise ticket is a maritime contract"). And it is not hard to understand why. Under *Kirby*, a contract whose "primary objective" is to accomplish the transportation of something by sea qualifies as a maritime contract and triggers admiralty jurisdiction. *Kirby*, 543 U.S. at 24. And here the ticket contract's primary objective was to accomplish the transportation of Plaintiffs by sea on board the *Liberty of the Seas*. Thus, the *Kirby* test is easily met.

Considering that Plaintiffs' claims arise from a dispute about the execution of a maritime contract, we are persuaded that *Kirby* and its progeny justify the exercise

15

of admiralty jurisdiction in this case. Although the Supreme Court treated *Kirby* as a contract case, we observe that both tort and contract claims were brought against Norfolk Southern because, at the heart of the matter, the trial court was being asked to assess whether Norfolk Southern's tortious conduct led to the derailment of the train and, if so, whether Norfolk Southern's tort liability could be limited by a clause embedded in a maritime contract. The Supreme Court held that admiralty jurisdiction existed in that case, and so we hold that it similarly exists here.

Unlike traditional tort cases that involve cruise lines, like a personal injury occurring on a vessel or during an excursion (which easily satisfy the location test), the tort claims in this case are far more tied to the essence of a maritime contract. That is, these tort claims are part and parcel of Plaintiffs' claim that Royal Caribbean did not timely cancel their contract and refund their deposits. In contractual terms, Plaintiffs are alleging that the consideration for their payment –the embarkation and transportation on the vessel – was no longer possible given the threat of dangerous weather. So, Defendant, knowing that to be the case, should have rescinded the contracts and made Plaintiffs whole, long before the Plaintiffs were in any zone of danger.

Having chosen to ignore the likelihood that Defendant was not going to be able to perform, Defendant's breach of contract resulted in emotional damages to the Plaintiffs that trigger tort liability for the consequential damages suffered. So these tort claims may arguably not directly satisfy a location test, but they do satisfy the alternative conclusion that the tort claims are directly and proximately related to the

Defendant's performance of a maritime contract.  That, according to *Kirby*, means that admiralty jurisdiction is satisfied even if the location test does not squarely resolve the dispute.

In sum, the nature of the tort case that arises so directly from performance of a maritime contract yields admiralty jurisdiction in this case.

## 2. *Embarkation is an essential function of the cruise experience.*

Even if admiralty jurisdiction is not triggered based on the unique nature of this case strictly arising from the terms and conditions of a maritime contract, an independent basis for admiralty jurisdiction also exists even under the location test. Binding case law teaches us that, when tortious conduct arises in the context of a pleasure cruise, the shore does not define the spatial limits of the location test.  *Doe*, 394 F.3d at 901-02; *see also, e.g.*, *Chaparro*, 693 F.3d at 1336; *Anderson*, 317 F.3d at 1236.  Accordingly, our superior courts have adopted an "expansive" view of admiralty jurisdiction and we must be cognizant of this reality when assessing the reach of our jurisdiction.  *Doe*, 394 F.3d at 901.

The communications that Plaintiffs rely on to form their tort claims were made by Royal Caribbean in connection with the vessel that Plaintiffs contracted to travel upon.   But unlike the cases where the location test was not satisfied because the issues therein reflected only an attenuated connection to maritime commerce – e.g., *Crowley*, *Lavender*, *Vincenzo*, *Broughton*, *Maher*, or *Hufnagel* – the communications at issue here directly concerned Plaintiffs' passage on a vessel in navigable waters. According to the operative complaint, it was communications regarding the scheduled

17

sailing of the *Liberty of the Seas* that brought Plaintiffs to the area surrounding their departure port in August 2017, and it was the last-minute cancellation of their cruise that left them stranded there after the storm.

This is substantively dissimilar from cases like *Vincenzo*, where the journey upon which the plaintiff was injured was defined by the plaintiff instead of the cruise line (because her cruise experience was already complete). Here, by contrast, *Royal Caribbean* defined the time and location in which Plaintiffs were to rendezvous with the *Liberty of the Seas*. Indeed, the day before Plaintiffs were scheduled to embark upon the ship, Royal Caribbean demonstrated their awareness that Plaintiffs had already traveled to the area surrounding the port and specifically instructed Plaintiffs to delay the last leg of their land-based journey until the cruise line gave them the green light to proceed. And the communications here are also distinguishable from cases like *Crowley* and *Broughton* because those cases concerned the cost of a maritime service or the protection of a maritime asset rather than the unique relationship between ticketed passengers and their carriers that exists until the voyage is complete.

In *Doe*, the Eleventh Circuit noted that the sexual battery "effectively began" on the cruise ship because the crew member encouraged his victim to visit a specific bar in the ship's port-of-call. *Doe*, 394 F.3d at 901. The pre-assault connections between the plaintiff and her assailant were "necessary precursors" to the tortious assault and those connections would not have been made without the involvement of the vessel. *Id*. Here, Royal Caribbean allegedly pressured its passengers to travel to

their departure port because their failure to timely board the *Liberty of the Seas* would result in the forfeiture of their ticket payments. Thus, in our view, the tortious conduct here also effectively began on the cruise ship because purchasing a ticket to sail on a specific voyage of the *Liberty of the Seas* was a necessary precursor for the alleged tortious conduct. *See id.* at 901.

The Court in *Doe* was also expressly cognizant that ports-of-call form an "essential function" of the cruise experience. *Id.* at 902. For obvious reasons, so too does the departure port. Without a starting point, a journey at sea cannot begin. Embarkation is therefore an essential function of the cruise experience.

Here, Royal Caribbean defined when and where Plaintiffs' embarkation would take place. And so, from Plaintiffs' perspective, all roads must lead to the gangplank. Thus, much as "Jane Doe was no less a cruise passenger the moment she stepped off the ship at the port of call," Plaintiffs qualified as cruise passengers from the moment they agreed to rendezvous with the *Liberty of the Seas* at the Port of Galveston on August 27, 2017. Therefore, under these circumstances, we cannot agree that the alleged torts lose their "salty flavor" simply because the communications at issue were generated from a headquarters adjacent to the sea as opposed to the sea itself. *See Kirby*, 543 U.S. at 22 (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1961)). Just as a cruise line's communications about a port-of-call can open the door to admiralty jurisdiction, so too can the cruise line's communications about a departure port because embarkation is a unique and essential function of the cruise

experience.  *See Doe*, 394 F.3d at 902; *see also Chapparo*, 693 F.3d at 1336.  Thus, admiralty jurisdiction exists in this case on this separate basis as well.

### C.   *Diversity jurisdiction is lacking due to pleading deficiencies.*

In addition to admiralty jurisdiction, Plaintiffs submit that this lawsuit can be maintained in federal court pursuant to diversity of citizenship.  *See* 28 U.S.C. § 1332 (defining the parameters of diversity jurisdiction).  Two problems exist with the diversity allegations in the operative complaint.

First, because Plaintiffs allege only their *residence* and not their *citizenship*, the pleading is defective from a jurisdictional perspective.  *Travaglio v. American Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013) ("Residence alone is not enough."); *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994) ("Citizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person.").  Plaintiffs' counsel concedes that this was an oversight on their part, which can be easily remedied in an amended pleading.  [D.E. 68 at 6].  We agree and therefore recommend that Plaintiffs be granted leave to file an amended complaint that fixes this deficiency.

Second, even if Plaintiffs pled citizenship instead of residency, diversity jurisdiction would still not exist with respect to the Plaintiffs who hail from countries other than the United States – e.g., Plaintiff Nikki McIntosh, a resident (and presumably a citizen) of Canada.  [D.E. 30 at ¶¶ 1, 10, 19-23, 32-34, 45].  According to the operative complaint, Royal Caribbean is a "foreign entity" with its principal place of business in Florida.  *Id*. at ¶ 78.  The parties do not dispute that, as a factual

matter, Royal Caribbean is a "foreign entity" because it is incorporated in Liberia. Thus, for diversity purposes, Royal Caribbean is a citizen of Liberia and Florida. *See* 28 U.S.C. 1332(c)(1) ("For the purposes of this section . . . a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business"); *Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1364-65 (11th Cir. 2018) ("Section 1332(c) governs the citizenship of corporations for purposes of diversity jurisdiction.").[4]  This is problematic because, if we assume that the foreign Plaintiffs are citizens of their respective foreign countries, then we have foreign citizens on both sides of this dispute, which in turn deprives the court of diversity jurisdiction over these foreign parties. *See* 28 U.S.C. § 1332(a)(2); *McIntosh v. Royal Caribbean, Ltd.*, 5 F.4th 1309, 1313 (11th Cir. 2021) ("Alienage diversity under 28 U.S.C. § 1332(a)(2) 'must be complete,' such that 'an alien on both sides of a dispute will defeat jurisdiction.'") (quoting *Caron*, 910 F.3d at 1364).  With respect to these foreign Plaintiffs, we find that they cannot proceed under diversity jurisdiction and instead must rely on another form of subject matter jurisdiction (e.g., admiralty jurisdiction) to proceed.

## D.  *CAFA jurisdiction is not alleged in the operative complaint.*

This case has a somewhat complicated procedural history.  Plaintiffs initially filed this case as a class action.  [D.E. 1].  In due course, the case was assigned to the Honorable James L. King and the Honorable Andrea M. Simonton.  [D.E. 2].  Royal

---

[4]      No Plaintiffs who allege residency in the United States are from Florida.

Caribbean then moved to dismiss the first complaint for, among other things, the class action waiver contained in Plaintiffs' ticket contracts.  [D.E. 7].  Judge King granted Royal Caribbean's motion to dismiss, but in doing so he did not reach the merits of Royal Caribbean's class action waiver argument. [D.E. 24].

Plaintiffs then filed their first amended complaint, which again brought this case as a class action.  [D.E. 25].  Royal Caribbean moved to dismiss the amended complaint in part because of the class action waiver in Plaintiffs' ticket contracts. [D.E. 26].  In granting this motion to dismiss, Judge King concluded that the class action waiver in Plaintiffs' ticket contract was enforceable and therefore barred Plaintiffs from bringing this case as a class action.  [D.E. 29].

Plaintiffs then filed the operative complaint, which dropped the class action allegations – as required by Judge King – and instead brought the case in the name of 130 individuals.  [D.E. 30].  Royal Caribbean again filed a motion to dismiss, which Judge King referred to Judge Simonton for a report and recommendation.  [D.E. 35, 40].  Judge Simonton recommended that Royal Caribbean's motion be denied.  [D.E. 43].  Judge King did not adopt Judge Simonton's recommendation; he instead *sua sponte* found that the Court lacked subject matter jurisdiction over the case and therefore concluded that the case should be dismissed with prejudice.  [D.E. 48].

Plaintiffs then appealed, and ultimately Judge King was reversed by the Eleventh Circuit for many different reasons.  *See McIntosh*, 5 F.4th at 1315.  Among the reasons warranting reversal, the Eleventh Circuit held that it was error to dismiss the case with prejudice due to lack of subject matter jurisdiction because a

court without jurisdiction lacks the power to rule on the merits of a dispute. *Id.* at 1313 ("If subject-matter jurisdiction does not exist, dismissal must be without prejudice."). The Eleventh Circuit also held that Judge King erred in how he ascertained the Court's lack of subject matter jurisdiction; therefore, the Eleventh Circuit declined to reach the Plaintiffs' challenges to Judge King's decisions on the merits (e.g., regarding the enforceability of the class action waiver) and remanded the case back to the Southern District of Florida for a jurisdictional assessment that comported with the Eleventh Circuit's opinion. *Id.* at 1315.

Judge King recused himself upon remand, and so the case was assigned to a different pair of judges. [D.E. 54]. Nevertheless, the second amended complaint remains the operative complaint. [D.E. 30]. Because the operative complaint does not contain any class action allegations, it does not allege subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").

The parties dispute whether the scope of the Eleventh Circuit's reversal opens the door to litigating this case as a class action. In its opinion, the Eleventh Circuit stated that "if there was no subject-matter jurisdiction, the court should have vacated its rulings on the merits of the plaintiffs' claims (unless it was going to issue alternative holdings on the merits for purposes of appeal in case diversity jurisdiction existed)." *McIntosh*, 5 F.4th at 1313.

Plaintiffs submit that the Eleventh Circuit has effectively vacated Judge King's rulings on the merits. Thus, CAFA theoretically provides an additional jurisdictional basis to litigate this case. Royal Caribbean argues that, regardless of

what the Eleventh Circuit did, the issue is not before this Court because the operative complaint does not allege CAFA jurisdiction.

Here, we agree with Royal Caribbean. The Eleventh Circuit did not reach the issue of whether Judge King's class action waiver analysis was legally sound; it decided only that his jurisdictional analysis was flawed and required revision. Having concluded that the Court has subject matter jurisdiction over this case based upon what is alleged in the operative complaint and the findings from our evidentiary hearing, we are reluctant to find that the Eleventh Circuit's opinion vacated all of Judge King's work on the merits. In other words, because this Court has never lacked jurisdiction over this case and because the Eleventh Circuit has not ruled one way or the other regarding Judge King's decisions on the merits, we have no reason to depart from Judge King's ruling regarding the impact of the class action waiver in Plaintiffs' ticket contracts. The Eleventh Circuit went only as far as it needed to, and here we do the same. The operative complaint does not allege CAFA jurisdiction, and therefore we cannot say that we have CAFA jurisdiction.

## III.   CONCLUSION

For the foregoing reasons, the Court finds that: (1) admiralty jurisdiction exists over all parties in this case; (2) a third amended complaint must be filed that specifies where each Plaintiff is a citizen of to satisfy diversity jurisdiction; and (3) CAFA jurisdiction does not exist because it is not alleged in the operative complaint.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar

24

the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 31st day of August 2023.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge